STATE of Minnesota, Respondent,

v.

THENG YANG, Appellant.

No. A11–1008.

Court of Appeals of Minnesota.

June 18, 2012.

Lori Swanson, Attorney General, St. Paul, MN; and John Choi, Ramsey County Attorney, Thomas R. Ragatz, Assistant County Attorney, St. Paul, MN, for respondent.

Jodie L. Carlson, Assistant Public Defender, St. Paul, MN; and Tara Reese Duginske, Special Assistant Public Defender, Briggs and Morgan, P.A., Minneapolis, MN, for appellant.

Considered and decided by RODENBERG, Presiding Judge; HALBROOKS, Judge; and ROSS, Judge.

## OPINION

ROSS, Judge.

A 911 operator received a report that an Asian male, who was wearing red pants at a specific St. Paul residence, had a gun. Police arrived and saw an Asian male with red pants in the front yard. They handcuffed the male, Theng Yang, asked him about the gun, and retrieved a handgun from his coat pocket. The district court convicted Yang of unlawful possession of a firearm by an ineligible person because a prior conviction made it a felony for him to possess a firearm anywhere. In this appeal from the denial of Yang's pretrial motion to suppress evidence, we must decide whether the officers' stop violated Yang's constitutional right to be free of unreasonable police seizures. We hold that the officers' actions violated Yang's constitutional rights because they had no reason to suspect that his conduct met the restrictive elements of Minnesota's handgun law.

## FACTS

On a November 2010 afternoon, Officers Michael McNeill and Seth Wilson were patrolling the St. Paul Frogtown neighborhood when a police dispatcher relayed a 911 report that an Asian male wearing red pants had a gun at a particular residential address in their area. The officers recognized the address, associating it with drugs and arrests.

Officers McNeill and Wilson, and others, arrived and saw four or five men of Asian descent entering the front yard from the porch, one of the men wearing red pants. The officers immediately took cover behind their squad cars, drew their handguns, and ordered the men to the ground. Officer Wilson handcuffed the man wearing red pants, Theng Yang, and asked him where the gun was. Yang told him that it was in his coat pocket. Officer Wilson found a handgun there. We assume that the officers at some point learned that the home was Yang's, but the record is silent about it.

Because he was previously convicted of a felony, Yang could not lawfully possess any firearm anywhere, so the state charged him with unlawful firearm possession. *See* Minn.Stat. §§ 624.713, subds. 1(2), 2(b), 609.11, subd. 5(b) (2010). Yang moved the district court to suppress evidence of the gun, arguing that the detaining police officers lacked a reasonable, articulable suspicion that he was involved in criminal activity. The district court denied the motion, deeming the stop to have been justified.

Yang waived his right to a jury and the state submitted the case to the district court judge in a stipulated-facts trial. *See State v. Lothenbach*, 296 N.W.2d 854, 857–58 (Minn.1980); Minn. R.Crim. P. 26.01, subd. 4. The district court found Yang guilty and convicted him of unlawful firearm possession. It sentenced him to 60 months in prison over his motion for a downward dispositional sentencing departure. Yang appeals, challenging the denial of his motion to suppress and the denial of his sentencing motion.

## ISSUE

Did the officers' investigatory stop violate Yang's Fourth Amendment right to be free of unreasonable searches and seizures?

## ANALYSIS

■ Yang challenges the denial of his motion to suppress evidence of the firearm, arguing that the stop violated his Fourth Amendment rights because the police officers did not have a reasonable, articulable suspicion that criminal activity was afoot. Where, as here, the district court denies a motion to suppress on undisputed facts, we independently consider whether those facts support the decision. *See State v. Timberlake*, 744 N.W.2d 390, 393 (Minn.2008).

■ The Fourth Amendment guarantees the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. A warrantless seizure is unreasonable unless it falls into a recognized exception. *State v. Flowers*, 734 N.W.2d 239, 248 (Minn.2007). The Supreme Court has recognized that warrantless, investigatory seizures that are limited in scope, duration, and purpose are reasonable if supported by circumstances that create an objectively reasonable suspicion of criminal activity. *Terry v. Ohio*, 392 U.S. 1, 30–31, 88 S.Ct. 1868, 1884–85, 20 L.Ed.2d 889 (1968). And when circumstances exist to create an objectively reasonable concern for officer safety, the officer engaged in a valid stop may also conduct a brief pat-down search for weapons. *Id.*

The moment when the constitutionally significant seizure occurred here is not in dispute. The seizure occurred once the officers drew their guns and ordered Yang and his companions to the ground. *See Brown v. Texas*, 443 U.S. 47, 50, 99 S.Ct. 2637, 2640, 61 L.Ed.2d 357 (1979) (noting that a seizure occurs when an officer "accosts an individual and restrains his freedom to walk away") (quotation omitted). Yang recognizes that this initial seizure was not an arrest requiring probable cause and that it was justified if the circumstances preceding it meet *Terry*'s lesser investigatory stop standard.

The state argues that the officers justifiably detained Yang on their suspicion that Yang was violating Minnesota's statute generally prohibiting a person from carrying a handgun in a public place. The relevant statute criminalizes public handgun possession without a permit: "A person ... who carries, holds, or possesses a pistol ... on or about the person's clothes or the person ... *in a public place*, as

defined in section 624.7181, subdivision 1, paragraph (c), without first having obtained a permit to carry the pistol is guilty of a [crime]." Minn.Stat. § 624.714, subd. 1a (2010) (emphasis added). The parties' dispute focuses on whether Yang's front yard is "a public place."

Asserting that a person not otherwise prohibited may lawfully carry a firearm on any private residential property regardless of whether that person holds a handgun-carry permit (because a residential yard is not a "public place"), Yang contends that the officers lacked justification for the seizure because they knew his yard was private property. Under these circumstances, argues Yang, the *Terry* standard was not met. The state counters by asserting that Minnesota law prohibits any person who lacks a handgun-carry permit from possessing a firearm anywhere outside his home or business, even on his own residential property (because a yard is a "public place"), so police may detain a person with a firearm in a private yard to determine whether he possesses a permit. Under these circumstances, argues the state, the *Terry* standard was met.

We look to the statute to determine whether the district court and the parties have accurately framed its meaning. Statutory interpretation is a question of law, which we review de novo. *State v. Larsen,* 650 N.W.2d 144, 147 (Minn.2002). We think that both Yang's and the state's arguments hang on flawed analyses of the statutory definition of "public place." We consider each argument.

### *"Public Place"*

Yang and the state come to different interpretations of "public place," each focusing largely on how the statute describes what is *not* a public place and then arguing for a different, purportedly necessary, negative inference. Section 624.714, subdivision 1a, prohibits only carrying a handgun

"in a public place, as defined in section 624.7181, subdivision 1, paragraph (c)." The parties emphasize and argue from the following negative language of section 624.7181, subdivision 1(c): " 'Public place' ... does *not* include: a person's dwelling house or premises, the place of business owned or managed by the person, or land possessed by the person." (Emphasis added.). Yang's attorney focused at oral argument on the indefinite article in the first clause of this passage—"*a* person's dwelling house or premises"—and would have us infer that this must mean *any* person's dwelling or premises. Under this theory, a large exclusion from the universe of "public places" is every private yard that adjoins *some* person's house, not merely the yard adjoining the house of the person carrying the handgun. Accordingly, argues Yang, even though police may not have known the yard was Yang's, they had no reason to stop him and inquire about the gun because they knew he was standing in a yard that of course belonged to *some* person.

We cannot accept Yang's interpretation of the exclusion because the interpretation arises unreasonably from the phrase, "*a* person's dwelling house or premises," ignoring the remainder of the provision, which also excludes "land possessed by *the* person." It is contextually evident that when the exclusion refers to "*a* person's dwelling house or premises," it cannot mean *any* person's house or premises, as Yang urges; it instead refers to the house or premises of the person whose handgun possession is at issue, just as it expressly refers to the land of "*the* person" whose handgun possession is at issue. In other words, for the exclusion to apply, the person referred to in section 624.714, subdivision 1a, who possesses the handgun, must be the same person referred to in

section 624.7181, subdivision 1(c), who possesses the property.

■ We also cannot accept the state's interpretation of the exclusion. The state asserted at oral argument that the officers reasonably investigated the handgun report by seizing persons in the residential yard because the exclusion's reference to "*land* possessed by the person" regards only rural, agricultural land, not residential land. As with Yang's argument, the state's argument fails under the plain wording of the statute. Nothing in the language of the exclusion supports the state's constrained definition of land. "Land" appears in the statute with no categorical qualification. And the statute expressly also excludes the person's "dwelling house *or premises.*" If the legislature wanted a narrower exclusion based on the nature or location of the "land possessed by the person" it would have drafted the statute in that fashion. "[C]ourts cannot supply that which the legislature purposely omits or inadvertently overlooks." *Wallace v. Comm'r of Taxation,* 289 Minn. 220, 230, 184 N.W.2d 588, 594 (1971).

■ But rejecting the parties' reasoning about what *is not* a public place does not answer whether Yang's front yard *is* a public place. For that, we look to the statutory language of what is a public place, and that language is plain:

> "Public place" means property owned, leased, or controlled by a governmental unit and private property that is regularly and frequently open to or made available for use by the public in sufficient numbers to give clear notice of the property's current dedication to public use.

Minn.Stat. § 624.7181, subd. 1(c). So a "public place" comes in two forms: (1) property that is governmentally owned, leased, or controlled, and (2) private property that has been dedicated to the public for its use. Land dedication to the public may occur by statute or by common law, but, like governmental land, dedicated private land is in the nature of publicly useable space, not in the nature of a person's front yard. *See, e.g.,* Minn.Stat. § 462.358, subd. 2b (2010) (authorizing municipal subdivision regulations to require that certain developable land be "dedicated to the public ... for public use as streets, roads, sewers, electric, gas, and water facilities, storm water drainage and holding areas or ponds and similar utilities and improvements, parks, recreational facilities, ... playgrounds, trails, wetlands, or open space"); *see also Wojahn v. Johnson,* 297 N.W.2d 298, 306–07 (Minn.1980) (discussing similarities between statutory and common-law dedication as both demonstrating the landowner's intent "to have his land appropriated and devoted to a public use, and an acceptance of that use by the public").

■ Focusing on that part of the statute that defines what is a public place rather than on the definition of what is not, it is easy to conclude that Yang's residential front yard does not fit either statutory category of a "public place." Neither party contends that a reasonable officer would have perceived Yang's yard to be governmental property or a space dedicated to and accepted by the public for public use. Rather than yield to the temptation to define a public place by negative inference from what the statute says is *not* a public place, as the parties' arguments suggest, we decide this issue without resolving the question of whether the yard is one of the excluded places. It is enough that it is not one of the included places.

We recognize that the statute leaves a substantial gap between the included and excluded classes of property, describing

narrowly what is a public place and describing narrowly what is not a public place; many properties seem to fit neither class (like, for example, the front yard of a person who is not suspected of carrying a handgun). And there is no apparent overlap between what is said to be a public place and what is said not to be. It would therefore appear that the legislature did not really intend for its list in the negative portion of the definition to be read as a list of exceptions to the positive portion of the definition. We also recognize that, under our reading, the negative portion has little apparent legal significance except in those few (if any) circumstances when some overlap might be found. In any event, the state's reasonable suspicion argument rests on the theory that Yang was reported to have a handgun in a public place, but he was found in an area that we hold is not a "public place."

Three cases might, on their surface, seem to suggest a different conclusion. On a closer look, they do not.

The first of these is *State v. DeLegge,* 390 N.W.2d 10 (Minn.App.1986). In *De-Legge,* we construed a prior version of the same statute to define "public place" broadly, reasoning that a person could not carry a handgun on any private property where discharging it might harm others, particularly in an urban setting. *Id.* at 12. But we constructed a definition there only because the statute at the time did not define "public place." *See id.* at 11. We were left to provide a judicial definition consistent with perceived legislative intent. *Id.* at 11–12. After *DeLegge* was decided, however, by enacting the Personal Protection Act of 2003 the legislature amended the statute into its current form, incorporating expressly the definition of "public place" in section 624.7181. *See* 2003 Minn. Laws ch. 28, art. 2, § 4 at 274. *DeLegge*'s

"public place" definition therefore does not control.

The second case is *State v. Gradishar,* where we held that, "[f]or purposes of section 624.7142, . . . 'public place' shall be defined as: generally an indoor or outdoor area, whether privately or publicly owned, to which the public have access by right or by invitation, expressed or implied, whether by payment of money or not." 765 N.W.2d 901, 903 (Minn.App.2009). We are convinced that *Gradishar* also does not apply here because it involved the carrying of a pistol in a public place while under the influence of alcohol, an offense that we held also lacked any statutory definition of "public place" and that called for a broader definition than the one embodied in section 624.7181. *Id.* at 903–04. And in coming to the broad definition, we expressly recognized that cases involving a person carrying a handgun in a public place under section 624.714, which is the proffered basis for Yang's detention, would instead trigger the narrow definition of 624.7181. *Id.* at 904.

The third case, *State v. Timberlake,* 744 N.W.2d at 391, also does not control here. Applying Fourth Amendment principles, the *Timberlake* court determined that police officers may briefly detain and frisk a person reported to be carrying a gun in a public place. *Id.* at 395–96. The officers in that case had detained Timberlake based on a tip that he was carrying a gun while driving from a gas station onto the public road. *Id.* at 392. Similar to Yang's argument, Timberlake contended that the officers could not have developed a reasonable suspicion of criminal activity because the tipster never mentioned that Timberlake lacked a permit; so, for all the officers knew, Timberlake might have been carrying the reported gun lawfully. *Id.* at 394. The supreme court rejected the argument, concluding that police properly

conducted a *Terry* stop to determine whether Timberlake had a carry permit. *Id.* at 395, 397; *see also State v. Hollins*, 789 N.W.2d 244, 250 (Minn.App.2010) (following *Timberlake* and holding that defendant's possession of a handgun at a nightclub was sufficient to create reasonable suspicion that he carried the gun unlawfully, absent any indication that he held a permit, justifying a *Terry* detention), *review denied* (Minn. Dec. 22, 2010).

Again, *Timberlake* does not help the state here. *Timberlake*'s holding rests on the supreme court's reasoning that *lacking* a handgun permit is not an element of the crime of carrying a gun in a public place; rather, *having* a permit is a mere exception to the crime. *Id.* at 396. So police developed reasonable suspicion that Timberlake's conduct met all the elements of the crime because he was reportedly carrying his handgun in a public place. *See id.* at 392, 397 (describing report that Timberlake was carrying a gun in a motor vehicle that had entered the public roadway from a gas station). Unlike the fact of a handgun-carrier's possibly lacking a handgun permit (the factor analyzed in *Timberlake*), a handgun-carrier's being in a public place *is* an element of the crime. *See* Minn.Stat. § 624.714, subd. 1(a). ("A person ... who carries ... a pistol ... in a public place ... is guilty of a [crime]."). And Yang contends that police lacked any reasonable suspicion that he was in a public place, touching on a central statutory element of the only suspected crime the state offered as its basis for the stop.

In sum, the negative implications of the statute's exclusions do not define a public place, the positive declarations of the statute define public place in a manner that does not include a residential yard, and the factually similar cases are legally distinguished.

### Stop Justification

 Applying the legislature's definition of "public place," we must now decide whether police were justified in seizing Yang. We hold that police lacked reasonable suspicion to seize him. We can surmise that the officers mistakenly understood that the handgun law generally prohibits persons from carrying a handgun in a private residential yard. An officer's mistaken interpretation of a statute cannot form an objectively reasonable basis for suspecting criminal activity and detaining a person. *State v. Anderson*, 683 N.W.2d 818, 823–24 (Minn.2004); *State v. George*, 557 N.W.2d 575, 578–79 (Minn.1997). When the police arrived, Yang was "coming out the front porch into the front yard," apparently nowhere near governmental property—a sidewalk or street, for example—and the state makes no claim of it. Although it turned out that Yang illegally possessed a firearm anyway because a previous conviction prohibited his possession, this is of no consequence to the stop because police had no reason to know that and because the state has attempted to justify the seizure instead only on the supposed suspected violation of the handgun statute. Similarly, the officers' awareness that drugs had been found and arrests had occurred previously at the home do not create reasonable suspicion to detain an occupant on a new report that he possesses a handgun.

Because police lacked reasonable suspicion to detain Yang, and because the unconstitutional detention and search produced the evidence that led to his conviction, we reverse his conviction.

### Sentencing Departure

Yang also argues that the district court abused its discretion by denying his sentencing motion for a downward dispositional departure. Because we reverse his con-

viction, we do not reach his sentencing challenge.

## DECISION

Carrying a pistol without a permit in a private yard is not carrying a pistol in a public place under sections 624.714 and 624.7181. Police unconstitutionally detained Yang then found the incriminating evidence on him in his front yard when they unreasonably suspected that his re- ported and observed conduct constituted the crime of carrying a pistol in a public place.

**Reversed.**