*This opinion will be unpublished and may not be cited except as provided by Minn. Stat. § 480A.08, subd. 3 (2014).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A15-0449**

State of Minnesota,
Respondent,

vs.

Vernon David Matter,
Appellant.

**Filed February 16, 2016
Reversed
Johnson, Judge
Dissenting, Connolly, Judge**

Renville County District Court
File No. 65-CR-14-163

Lori Swanson, Attorney General, Matthew Frank, Assistant Attorney General, St. Paul, Minnesota; and

David J. Torgelson, Renville County Attorney, Olivia, Minnesota (for respondent)

Scott Cody, Tarshish Cody, PLC, Richfield, Minnesota (for appellant)

Considered and decided by Connolly, Presiding Judge; Johnson, Judge; and Klaphake, Judge.*

---

*Retired judge of the Minnesota Court of Appeals, serving by appointment pursuant to Minn. Const. art. VI, § 10.

UNPUBLISHED OPINION

**JOHNSON**, Judge

Vernon David Matter was convicted of possessing a controlled substance and possessing a short-barreled shotgun. The incriminating evidence was found in a search of Matter's farm, which was conducted pursuant to a search warrant. The search warrant was based on information that a deputy sheriff obtained while conducting a protective-sweep search of Matter's farm on a prior occasion. On appeal, Matter argues that the search warrant is invalid because the deputy sheriff exceeded the proper scope of a protective sweep during the prior search. We agree with Matter that the deputy sheriff exceeded the proper scope of a protective sweep by initiating an investigation that was unrelated to the purposes of the protective sweep. Accordingly, the district court erred by denying Matter's motion to suppress evidence. Therefore, we reverse.

**FACTS**

This appeal arises from a traffic stop on a country road, which evolved into a tense struggle involving multiple persons and multiple officers at a farm, which gave rise to a subsequent investigation into a rifle that was present at the farm, which led to the discovery of physical evidence that Matter committed the offenses of which he was charged and convicted.

On April 23, 2014, at approximately 8:40 p.m., Renville County Deputy Sheriff Jeff Nelson was observing traffic in a stationary unmarked car on 870th Avenue, a gravel road in a rural part of the county. He observed a vehicle fail to signal a turn onto southbound highway 4. As he followed the vehicle, he also observed the vehicle cross

the center line four times and the fog line once. He radioed for a marked squad car to stop the vehicle and investigate.

Renville County Sergeant Douglas Best heard Deputy Nelson's request, observed the vehicle traveling south on highway 4, and followed it. He initiated a traffic stop after the vehicle turned east on county road 23. The vehicle did not stop immediately but continued slowly to a driveway on the south side of county road 23, turned into the driveway, and eventually stopped in a farmyard with a farmhouse and multiple outbuildings.

Sergeant Best parked his squad car behind the vehicle. He approached the passenger side of the vehicle and spoke with the front-seat passenger, who identified himself as Juan Bautista. Sergeant Best believed that Bautista was concealing something in his hand and asked him to step out of the vehicle. As Bautista did so, he dropped an item that Sergeant Best recognized as drug paraphernalia. Bautista then fled on foot. Sergeant Best ran after him and followed him into the farmhouse, which led to a physical struggle. Sergeant Best was able to subdue Bautista only after two other officers, Renville County Chief Deputy Sheriff Doug Pomplun and Renville County Deputy Sheriff Tom Swyter, arrived and provided assistance.

Meanwhile, Deputy Nelson, who had arrived at the scene shortly after Sergeant Best, was engaged in an encounter with another man, who later was identified as Matter. Matter walked toward the stopped vehicle while waving a revolver in his right hand and yelling at the officers to get off his property. Deputy Nelson aimed his service weapon at Matter and ordered him to drop the revolver. Matter lowered it but did not drop it.

3

Deputy Nelson ordered Matter to lie on the ground, but Matter did not do so. Deputy Nelson attempted to subdue Matter with a Taser but was unsuccessful. Deputy Nelson attempted to physically restrain Matter, which led to a struggle in which Matter elbowed Deputy Nelson in the chest and head. Deputy Nelson eventually subdued Matter with mace and took away his revolver.

After Bautista and Matter were arrested, Sergeant Best said to the other officers that, when he first arrived at the farm, he observed a man named Rey Guerrero standing in the farmyard, near a barn. Sergeant Best was familiar with Rey Guerrero because their children attended the same school. Rey Guerrero is the brother of Alejandro Guerrero, who was the driver of the vehicle that was pulled over. Sergeant Best noticed that Rey Guerrero had not been detained and asked the officers to search the farm in an attempt to find him. Sergeant Best later testified that the purpose of the search for Rey Guerrero was to ensure the safety of the officers on the scene.

The farmyard area was estimated by one officer to be approximately five to eight acres in area. During the search for Rey Guerrero, Deputy Pomplun saw a large shed on the east side of the property, approximately 100 feet from the barn. The shed was open, and lights were on inside. Deputy Pomplun entered the shed and quickly determined that no other person was in the shed. But he observed a rifle lying on a couch inside the shed. He walked over to the couch, picked up the rifle, and removed the ammunition. Before setting the rifle down, he looked at the serial number on the rifle. While holding the rifle in one hand, he used his other hand to place a call on his portable radio to his dispatcher and read the serial number to the dispatcher. Deputy Pomplun later testified that he did

4

so "to find out if it was stolen." The dispatcher referred to a database and informed Deputy Pomplun that the rifle had not been reported stolen. When he exited the shed, Deputy Pomplun left the rifle on the couch. He also left the ammunition on the couch, which he testified was an "oversight."

The officers did not find Rey Guerrero on the farm that evening. Alejandro Guerrero was arrested for driving while impaired and possession of a controlled substance. Bautista was arrested for assault of a police officer, fleeing a police officer, and possession of a controlled substance. Matter was arrested for assault with a dangerous weapon, assault of a police officer, possession of drug paraphernalia, disorderly conduct, and obstructing legal process. Another passenger of the stopped vehicle was released without being cited. The record in this case does not reveal whether Alejandro Guerrero or Bautista were prosecuted for their conduct at the farm that evening.

The following day, Deputy Pomplun decided to conduct further investigation into the rifle that he had found in the shed at Matter's farm. He entered the model and serial number of the rifle into a federal database in an attempt to learn where the rifle had been purchased. He later received a report indicating that the registered owner of the rifle was D.G., a resident of Sibley County. Deputy Pomplun attempted to contact D.G. but was unsuccessful. He contacted the Sibley County sheriff's office and was informed that D.G. had passed away but that his daughter had reported that firearms had been stolen from her father's empty home after his death.

Renville County Investigator Tom Hendrichs obtained additional information about the items that had been stolen from D.G.'s home. Investigator Hendrichs prepared an application for a warrant to search Matter's farm for those items, which included, among other things, four firearms, a computer monitor, a personal computer, and a video camera. On May 29, 2014, the application was submitted to a judge, who approved it. On the same day, deputy sheriffs executed the warrant by searching Matter's farm. They found the rifle that Deputy Pomplun had seen and handled on April 23 but did not find the other items identified in the warrant. But the officers came across a substance that field testing revealed to be more than 200 grams of methamphetamine. The officers then obtained a second search warrant, which authorized a search of Matter's farm for evidence of controlled substances. The execution of the second search warrant led to the discovery of controlled substances, drug paraphernalia, a scale, approximately $11,500 in cash, and a short-barreled shotgun whose serial number had been obliterated.

On June 2, 2014, the state charged Matter with four offenses based on the evidence found at his farm on May 29, 2014: (1) first-degree controlled substance crime, in violation of Minn. Stat. § 152.021, subd. 2(a)(1) (2012); (2) possession of stolen property, in violation of Minn. Stat. § 609.53, subd. 1 (2012); (3) possession of a firearm with an altered serial number, in violation of Minn. Stat. § 609.667(2) (2012); and (4) possession of a short-barreled shotgun, in violation of Minn. Stat. § 609.67, subd. 2 (2012).

In July 2014, Matter moved to suppress the evidence found in the searches of his farm on May 29, 2014. In August 2014, the district court conducted an evidentiary

6

hearing on the motion. The state called three witnesses: Investigator Hendrichs, Deputy Pomplun, and Sergeant Best. Matter called one witness, a law-enforcement officer who participated in the search for Rey Guerrero. In a post-hearing memorandum, Matter argued that all evidence obtained in executing the search warrants should be suppressed for two reasons: first, that police officers on April 23, 2014, lacked a reasonable, articulable suspicion that Rey Guerrero was in the east shed and posed a threat to the officers and, second, that Deputy Pomplun exceeded the proper scope of the protective-sweep search. In September 2014, the district court issued an order in which it denied the motion to suppress. The district court reasoned that Deputy Pomplun's search of the shed on April 23, 2014, was conducted as part of a lawful protective sweep, that the rifle was in plain view, and that Deputy Pomplun was justified in removing ammunition from the rifle as a means of promoting officer safety.

In December 2014, the parties agreed to a stipulated-evidence court trial. *See* Minn. R. Crim. P. 26.01, subd. 4. In January 2015, the district court found Matter guilty on counts 1, 3, and 4, and not guilty on count 2. In March 2015, the district court imposed concurrent prison sentences of 84 months on count 1 (possession of a controlled substance) and 15 months on count 4 (possession of a short-barreled shotgun). Matter appeals.

## D E C I S I O N

Matter argues that the district court erred by denying his motion to suppress evidence. He first contends that Deputy Pomplun's warrantless entry into the shed is not justified by the protective-sweep doctrine or any other exception to the Fourth

7

Amendment. He also contends, in the alternative, that if Deputy Pomplun's warrantless entry into the shed is justified by the protective-sweep doctrine, the officer later exceeded the proper scope of a valid protective sweep by calling the dispatcher to report the serial number of the rifle. The parties agree that Matter's conviction is based on evidence obtained because of the execution of the search warrants on May 29, 2014; that the search warrants were obtained based on information concerning the rifle that Deputy Pomplun had found in the shed on April 23, 2014; and that the information concerning the rifle was obtained because of Deputy Pomplun's warrantless entry into the shed and his report to the dispatcher of the serial number of the rifle. If the underlying facts are not in dispute, this court applies a *de novo* standard of review to a district court's denial of a motion to suppress evidence. *State v. Gauster*, 752 N.W.2d 496, 502 (Minn. 2008).

The Fourth Amendment to the United States Constitution guarantees the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures" and states that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV; *see also* Minn. Const. art. I, § 10. If an application for a search warrant contains information that was obtained in violation of the Fourth Amendment, the search warrant is invalid, and evidence gathered in the execution of the search warrant must be suppressed. *See Murray v. United States*, 487 U.S. 533, 537-42, 108 S. Ct. 2529, 2533-36 (1988); *State v. McClain*, 862 N.W.2d 717, 727 (Minn. App. 2015).

8

The state argues that Deputy Pomplun's warrantless entry into the shed and his calling the dispatcher to report the serial number of the rifle are justified by the protective-sweep doctrine. "A 'protective sweep' is a quick and limited search of premises, incident to an arrest and conducted to protect the safety of police officers or others," which is "narrowly confined to a cursory visual inspection of those places in which a person might be hiding." *Maryland v. Buie*, 494 U.S. 325, 327, 110 S. Ct. 1093, 1094 (1990). As "an incident to arrest," a law-enforcement officer may, "as a precautionary matter and without probable cause or reasonable suspicion, look in closets and other spaces immediately adjoining the place of arrest from which an attack could be immediately launched." *Id.* at 334, 110 S. Ct. at 1098. In addition, a protective sweep may be conducted in areas beyond the spaces immediately adjoining the place of arrest, so long as there are "articulable facts which, taken together with the rational inferences from those facts, would warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger to those on the arrest scene." *Id.* A protective sweep is "not a full search of the premises" but, rather, "may extend only to a cursory inspection of those spaces where a person may be found" and may "last[] no longer than is necessary to dispel the reasonable suspicion of danger and in any event no longer than it takes to complete the arrest and depart the premises." *Id.* at 335-36, 110 S. Ct. at 1099; *see also State v. Bergerson*, 671 N.W.2d 197, 202-03 (Minn. App. 2003), *review denied* (Minn. Jan. 20, 2004).

9

## A.

We first consider Matter's first argument, that Deputy Pomplun's warrantless entry into the shed is not justified by the protective-sweep doctrine, for two reasons: first, because the officers did not have reasonable suspicion that Rey Guerrero was in the shed and, second, because the officers did not have reasonable suspicion that Rey Guerrero posed a danger to the officers.

With respect to Matter's first asserted reason why Deputy Pomplun's warrantless entry into the shed was improper, the district court focused primarily on the question whether the protective-sweep doctrine could justify a warrantless search of an area that is distant from the place of arrest. The district court resolved that question by reasoning that the shed was not excessively distant from the place where Sergeant Best saw Rey Guerrero and not excessively distant from the place where the vehicle had been stopped and where Matter had been arrested. On appeal, Matter does not challenge the elasticity of the protective-sweep doctrine by arguing that a protective sweep never may be performed throughout a property of the size of Matter's farmyard. Rather, he accepts the premise that officer safety may be endangered by a person lurking somewhere in a large area. *See United States v. Davis*, 471 F.3d 938, 944-45 (8th Cir. 2006) (approving protective sweep of barn following arrest of person in farmhouse); *see also United States v. Colbert*, 76 F.3d 773, 776-77 (6th Cir. 1996) (holding that protective-sweep doctrine may extend to inside of building even if person is arrested outside). Matter contends more particularly that neither Deputy Pomplun nor any other officer had a reasonable suspicion that Rey Guerrero was inside the shed.

10

The district court recognized that several officers were looking for Rey Guerrero throughout Matter's farmyard because they had reason to believe that he likely was present somewhere on the farm. The evidence in the record supports that belief. Accordingly, Deputy Pomplun was justified in looking in places on the farm property where Rey Guerrero might be hiding. In particular, Deputy Pomplun could reasonably believe that Rey Guerrero was in the shed because the shed was open and the inside lights were on. Thus, Deputy Pomplun had a reasonable suspicion that Rey Guerrero might be present in the shed.

With respect to Matter's second asserted reason why Deputy Pomplun's warrantless entry into the shed was improper, the district court determined that the officers had reason to believe that Rey Guerrero might pose a danger to them. The district court acknowledged that Rey Guerrero had not made any threatening gestures but reasoned that it was "not unreasonable to infer that individuals on the defendant's property would be sympathetic to the individuals being detained and arrested by the officers," especially in light of the fact that Rey Guerrero is a brother of Alejandro Guerrero, the driver of the stopped vehicle. We agree with the district court. In light of the hostility and physical resistance that other persons on the property had displayed, the officers were justified in believing that another person, who had been present on the property but was unaccounted for, who was related to a person who had been stopped and was subject to investigation, might be lurking nearby with the intention of attacking the officers. In addition, the officers were especially vulnerable because they were unexpectedly present at a relatively large, unfamiliar place, after sunset. Thus, the

11

officers had a reasonable suspicion that Rey Guerrero posed a threat to the officers' safety.

Therefore, the district court did not err by determining that Deputy Pomplun's warrantless entry into the shed is justified by the protective-sweep doctrine.

**B.**

We next consider Matter's alternative argument, that even if Deputy Pomplun's warrantless entry into the shed is justified by the protective-sweep doctrine, he exceeded the proper scope of a valid protective sweep by "lingering to call in the rifle's serial number." On appeal, Matter does not challenge Deputy Pomplun's decision to remove the ammunition from the rifle, as he argued to the district court. He argues only that Deputy Pomplun went too far by calling the dispatcher and reporting the serial number of the rifle while the protective-sweep search was ongoing.

Our analysis of Matter's argument is based on the United States Supreme Court's articulation of the purpose of a protective sweep. To reiterate, the Court stated in *Buie* that a protective sweep is "a quick and limited search of premises," which is "conducted to protect the safety of police officers or others." 494 U.S. at 327, 110 S. Ct. at 1094. The Supreme Court emphasized that a protective sweep is "not a full search of the premises" but, rather, is limited spatially to "a cursory inspection of those spaces where a person may be found" and is limited temporally to a time period that is "no longer than is necessary to dispel the reasonable suspicion of danger." *Id.* at 335-36, 110 S. Ct. at 1099.

The evidence in the record demonstrates that Deputy Pomplun went beyond the proper scope of a valid protective sweep when he called the dispatcher, reported the serial

12

number of the rifle, and waited for the dispatcher to refer to a database and report back that the rifle had not been reported as stolen. Those actions did not serve the purpose of "protect[ing] the safety of police officers or others." *See id.* at 327, 110 S. Ct. at 1094. In fact, Deputy Pomplun testified at the omnibus hearing that he called the serial number into the dispatcher "to find out if it was stolen." Whether the rifle had been stolen had no bearing on the safety of the officers and other persons who were present at the farm at that time. A stolen rifle would pose no more danger than a rifle that had not been stolen. Whether the rifle had been stolen was relevant only to Deputy Pomplun's suspicion of other criminal activity. Indeed, Deputy Pomplun followed up on that suspicion the next day by taking steps to determine whether the rifle had been stolen. The subsequent investigation was possible only because Deputy Pomplun had commenced the investigation while he was in the shed by calling the dispatcher, reporting the serial number of the rifle, and waiting for the dispatcher to give him more information. But Deputy Pomplun was inside the shed only for the limited purpose of protecting the safety of the officers who were investigating and making arrests at Matter's farm.

The state makes two counterarguments. First, the state argues that Deputy Pomplun's call to the dispatcher did not extend the duration of the protective sweep. As a factual matter, there is no evidence in the record as to how much time was required for Deputy Pomplun to call the dispatcher, report the serial number of the rifle, and wait for the dispatcher to refer to a database and report back that the rifle had not been reported stolen. There also is no evidence in the record as to when the other officers completed their parts of the protective sweep. But those factual matters are not material. In *Buie*,

13

the Supreme Court made clear that a protective sweep may last "no longer than is necessary to dispel the reasonable suspicion of danger." *Id.* at 335-36, 110 S. Ct. at 1099. The federal caselaw indicates that an action that is very short in duration may go beyond the proper scope of a valid protective sweep. For example, in *United States v. Ford*, 56 F.3d 265 (D.C. Cir. 1995), the court concluded that officers who arrested a suspect near his bedroom exceeded the proper scope of a valid protective sweep by lifting a mattress to look underneath and by looking behind window shades. *Id.* at 270. Similarly, in *Cuevas v. De Roco*, 531 F.3d 726 (9th Cir. 2008), the court concluded that officers who arrested a suspect in his home exceeded the proper scope of a valid protective sweep by opening a drawer. *Id.* at 735.

Our resolution of the parties' contentions concerning the proper scope of a protective-sweep search does not hinge on the applicability of the plain-view doctrine. Matter does not contend that the plain-view doctrine does not apply. The key question is, assuming all requirements of the plain-view doctrine are satisfied, whether Deputy Pomplun's actions also satisfy the requirements of the protective-sweep doctrine, which is the justification for his warrantless entry into the shed. In *Horton v. California*, 496 U.S. 128, 110 S. Ct. 2301 (1990), a plain-view case, the Supreme Court cited *Buie*, the seminal protective-sweep case, in stating that "a warrantless search [must] be circumscribed by the exigencies which justify its initiation," *id.* at 139-40, 110 S. Ct. at 2309 (citing, as example, *Buie*, 494 U.S. at 332-34, 110 S. Ct. at 1098-99), and that "[s]crupulous adherence to [the] requirements" of the doctrine that justifies a warrantless search "serves the interests in limiting the area and duration of the search," *id.* at 140, 110

14

S. Ct. at 2309. This statement implies that a warrantless search that is justified by the protective-sweep doctrine must, at all times, be limited to the scope of a proper protective sweep, even if an incriminating item in plain view might, in other circumstances, warrant further investigation.

Second, the state argues that Deputy Pomplun did not conduct a "search," for Fourth Amendment purposes, by calling the dispatcher, reporting the serial number of the rifle, and waiting for the dispatcher to refer to a database and inform him of the result. The state's argument is inconsistent with *Arizona v. Hicks*, 480 U.S. 321, 107 S. Ct. 1149 (1987), in which a police officer entered a residence without a warrant to investigate a shooting and, while inside the residence, picked up and moved some stereo components, read serial numbers that were not visible before the stereo components were moved, and reported the serial numbers by telephone to police headquarters. *Id.* at 323-24, 107 S. Ct. at 1152. The Supreme Court reasoned that "taking action, unrelated to the objectives of the authorized intrusion, which exposed to view concealed portions of the apartment or its contents, did produce a new invasion of [Hicks's] privacy unjustified by the exigent circumstance that validated the entry." *Id.* at 325, 107 S. Ct. at 1152. The Supreme Court referred to this part of *Hicks* in *Buie*, the seminal case concerning protective sweeps. The Court noted in *Buie* that the officer in *Hicks* "was searching for evidence plain and simple" and that "[t]here was no interest in officer safety or other exigency at work in that search." *Buie*, 494 U.S. at 335 n.3, 110 S. Ct. at 1099 n.3 (discussing *Hicks*, 480 U.S. at 325, 328, 107 S. Ct. at 1153, 1154). The Supreme Court reiterated that protective-sweep searches "are permissible on less than probable cause only because they

15

are limited to that which is necessary to protect the safety of officers and others." *Buie*, 494 U.S. at 335 n.3, 110 S. Ct. at 1099 n.3.

In this case, Deputy Pomplun testified that he reported the serial number to the dispatcher after he picked up the rifle and that he was unable to read the serial number before he picked up the rifle. Thus, Deputy Pomplun conducted a search for Fourth Amendment purposes when he picked up the rifle and read the serial number, which he would not have been able to read if he had not picked it up. In any event, even if Deputy Pomplun did not conduct a search for Fourth Amendment purposes when he picked up the rifle and read the serial numbers, the state's reliance on *Hicks* would not justify Deputy Pomplun's next action: calling the dispatcher to report the serial number and waiting for the dispatcher to report back as to whether the rifle had been reported stolen. For the reasons stated above, that action exceeded the proper scope of a protective sweep.

The state also cites *Arizona v. Johnson*, 555 U.S. 323, 129 S. Ct. 781 (2009), and *Illinois v. Caballes*, 543 U.S. 405, 125 S. Ct. 834 (2005), in support of its argument that Deputy Pomplun's actions were not prohibited by the Fourth Amendment. Those two opinions are inapplicable because they are not concerned with protective sweeps; rather, they are concerned with the actions that an officer may take during an investigatory stop. *See Johnson*, 555 U.S. at 333, 129 S. Ct. at 788; *Caballes*, 543 U.S. at 408-09, 125 S. Ct. at 837-38. The caselaw governing investigatory stops gives law-enforcement officers the flexibility to respond to additional information that suggests additional criminal activity. The caselaw expressly authorizes an officer to expand the scope of an investigatory stop if the officer acquires information during the stop that gives rise to a reasonable suspicion

16

of other criminal activity, even if officer safety is not threatened. *See State v. Smith*, 814 N.W.2d 346, 350 (Minn. 2012); *State v. Diede*, 795 N.W.2d 836, 845 (Minn. 2011); *State v. Askerooth*, 681 N.W.2d 353, 364 (Minn. 2004); *State v. Wiegand*, 645 N.W.2d 125, 135 (Minn. 2002). But the caselaw concerning investigatory stops is inapplicable to this case because an officer conducting a protective sweep is subject to narrower restrictions: "a cursory inspection of those spaces where a person may be found" that is "no longer than is necessary to dispel the reasonable suspicion of danger." *Buie*, 494 U.S. at 335-36, 110 S. Ct. at 1099. Neither the United States Supreme Court nor the Minnesota Supreme Court has expressly authorized an officer to expand a protective-sweep search beyond the limitations described in *Buie*. Moreover, the Supreme Court's post-*Buie* caselaw suggests that *Buie*'s limitations would continue to govern even if an incriminating item were found in plain view during a protective-sweep search. *See Horton*, 496 U.S. at 139-40, 110 S. Ct. at 2309.

Thus, the district court erred by concluding that Deputy Pomplun did not exceed the proper scope of a valid protective sweep when he called the dispatcher, reported the serial number of the rifle, and waited for the dispatcher to refer to a database and report back to him as to whether the rifle had been reported stolen. Because the parties agree that the information derived from those actions was the basis of the search warrants that were obtained on May 29, 2014, the district court should have suppressed the evidence obtained in the execution of those warrants.

Because the parties agreed to a stipulated-evidence court trial pursuant to rule 26.01, subdivision 4, our conclusion that the district court erred in its pre-trial ruling is

17

dispositive of the case, and a contested trial is unnecessary. *See* Minn. R. Crim. P. 26.01, subd. 4(a), (c); *see also State v. Yang*, 814 N.W.2d 716, 718, 722-23 (Minn. App. 2012) (reversing conviction without remand after concluding that district court erred in pre-trial ruling in case tried pursuant to rule 26.01, subdivision 4).

**Reversed.**

**CONNOLLY**, Judge (dissenting)

I agree with the majority's conclusion that the officer's entry and search of the shed were lawful, but I respectfully dissent from its conclusion that the officer exceeded the permissible scope of a protective sweep when, during his search of the shed, he reported the serial number on the rifle he saw in plain view. Consequently, I would affirm the district court's decision not to suppress the evidence and affirm appellant's felony convictions for possession of a controlled substance and possession of a short-barreled shotgun.

This issue involves two exceptions to the warrant requirement: the protective-sweep exception and the plain-view exception. The protective-sweep search exception, "aimed at protecting . . . officers," is set out in *Maryland v. Buie*, 494 U.S. 325, 335,110 S. Ct. 1093, 1099 (1999). It is limited in space (to "'a cursory inspection of those spaces where a person may be found'") and in time ("'no longer than is necessary to dispel the reasonable suspicion of danger and in any event no longer than it takes to complete the arrest and depart the premises'"). *State v. Bergerson*, 671 N.W.2d 197, 202 (Minn. App. 2003) (quoting *Buie,* 494 U.S. at 335, 336, 110 S. Ct. at 1099).

The plain-view exception, in contrast, is aimed at protecting evidence and is set out in *Minnesota v. Dickerson*, 508 U.S. 366, 375-76, 113 S. Ct. 1230, 2136-37 (1993). It is limited to the seizure of items: (1) seen by police who were lawfully in a position from which they could see the items, (2) whose incriminating character was immediately apparent, and (3) to which the officers

had a lawful right of access.  *In re G.M.*, 560 N.W.2d 687, 693 (citing *Dickerson*, 508 U.S. at 375, 113 S. Ct. at 2136-37).  The two exceptions are far from mutually exclusive; in fact, they may be invoked simultaneously.  An officer engaged in a lawful protective sweep "need not close his eyes to what he sees during the sweep, and any contraband that he observes in plain view may lawfully be seized." *United States v. Arch*, 7 F.3d 1300, 1303 (7th Cir. 1993) (citing *Buie*, 494 U.S. at 330, 110 S. Ct. at 1096).

Here, the officer was making a cursory inspection of the shed, where a person (specifically, the one person who had been seen on the property and had not yet been found) could have been concealed, thus fulfilling the purpose of the protective-sweep exception: protecting officers.  *See Buie*, 494 U.S. at 335, 110 S. Ct. at 1099.  The officer's presence in the shed, where he saw the rifle, with its serial number facing him, lying visible on a couch, was lawful; so was his right of access to the rifle, thus fulfilling the first and third requirements of the plain-view exception.

Moreover, "common sense dictates that a firearm that could be accessed by someone at the scene and used against officers or others should be unloaded . . . ."[1] *United States v. Rodriguez*, 601 F. 3d 402, 408 (5th Cir. 2010).  To discover whether the rifle was loaded, and, if it was, to unload it, the officer had to pick it up and open it. When he did so, the serial number became legible to him, as the

---

[1] The officer's act in inadvertently leaving the shells next to the rifle instead of removing them does not affect the lawfulness of his decision to remove them.

attached photograph of the rifle indicates. But the fact that the serial number became legible because the officer picked up and opened the rifle does not mean that the officer manipulated the rifle so he could read the serial number. When asked at the omnibus hearing if his purpose in picking up the rifle was to view the serial number, the officer answered, "It was not"; when asked if his purpose was to ensure that the rifle was unloaded, he answered, "Yes." The district court said that it "accept[ed] his testimony as credible," and this court defers to a factfinder's credibility determinations. *See State v. Al-Naseer,* 788 N.W.2d 469, 473 (Minn. 2010) (noting that factfinder is in the best position to assess the credibility of witnesses).

There remains only the second requirement of the plain-view exception: was the incriminating character of the rifle immediately apparent? I understand and appreciate that the right to possess a firearm is guaranteed by the second amendment. *District of Columbia v. Heller*, 554 U.S. 570, 635, 128 S. Ct. 2783, 2821-22 (2008) (holding that a "ban on handgun possession in the home violates the Second Amendment"). But, while a rifle, by itself, may not be incriminating, it is necessary to consider the context of the situation. Here, in the brief incident giving rise to the protective sweep, one person had been waving a pistol around, refused to drop it when told to do so by an officer, and had to be subdued by officers before he was arrested; another person was observed dropping drug paraphernalia, ran from the officers, and had to be subdued prior to arrest; two other people were arrested; and a fifth person on the scene disappeared and was

believed to be somewhere on the property. Under these circumstances, an unattended, loaded rifle in an unoccupied, open building was incriminating.[2] The requirements for both the protective-sweep exception and the plain-view exception to the warrant requirement were satisfied.

Moreover, even if the rifle's incriminating character was not immediately apparent, I simply do not believe there was a search or a seizure when the officer ran a check on the serial number, nor do I believe there is a search or a seizure when an officer runs a check on a license plate of an automobile. This case is very different from *Arizona v. Hicks*, 480 U.S. 321, 107 S. Ct. 1149 (1987) (addressing whether an officer's moving of stereo equipment to locate its serial number constituted a search).

> [The] moving of the [stereo] equipment . . . did constitute a "search" separate and apart from the search for the shooter, victims, and weapons that was the lawful objective of his entry into the apartment. *Merely inspecting those parts of the turntable that came into view during the latter search would not have constituted an independent search, because it would have produced no additional invasion of respondent's privacy interest.*

*Arizona v. Hicks,* 480 U.S. 321, 324-25, 107 S. Ct. 1149, 1152 (1987) (emphasis added). In *Hicks,* the police officer *had no* reason to move the stereo equipment other than to locate the serial number and determine if the equipment had been stolen. Here, the officer *had* an independent reason for handling the rifle: he had

---

[2] *See United States v. Rodriguez,* 711 F. 3d 928, 936-37 (8th Cir. 2013) (concluding that incriminating nature of guns was immediately apparent because they were in close proximity to drugs and drug-related equipment).

to determine if it was loaded. In the course of doing so, he observed the serial number and immediately reported it. That is precisely what the U.S. Supreme Court said was permissible. *See id.*

This case is also similar to *Commonwealth v. Ramsey*, 744 S.W. 2d 418, 418 (Ky. 1987) (rejecting the argument that copying the serial number of a chain saw found in a vehicle by an officer who had just arrested the driver was an unlawful seizure).[3]

> [A police officer's t]aking a serial number from a chain saw located in the passenger compartment of the arrestee's vehicle and believed by the police officer to be stolen, incident to a lawful custodial arrest, was a lawful search.
> The arrest and search [were lawful] and the copying of the chain saw's serial number [was] not an unreasonable seizure.

*Id.* at 419. Here, the officer's decision to report the serial number of a rifle he was already lawfully holding did not violate the warrant requirement or impinge on appellant's Fourth-Amendment rights. The rifle had been left, unattended, accessible, and loaded, in a building that the officer had lawfully entered, and the officer lawfully picked it up, opened it, and unloaded it. His right to report the serial number of the rifle in his hand was not cancelled because a protective sweep was going on at the time. "The Fourth Amendment . . . does not . . . require tunnel vision." *State v. Shevchuk*, 291 Minn. 365, 367, 191 N.W.2d 557, 559 (1971) (holding that an officer approaching a traffic violator in an automobile is "is not

---

[3] There appears to be no Minnesota case directly on point. While the Kentucky case is not dispositive, it is persuasive.

required to avert his eyes from anything else inside of the automobile lest he should see criminal contents in plain sight"). Nor is an officer lawfully handling a rifle required to avert his eyes from, or to refrain from reporting, its serial number.

